## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| GUILLERMO ROWE, derivatively on behalf of NATERA, INC.,<br><br>       Plaintiff,<br><br>  v.<br><br>STEVE CHAPMAN, MATTHEW RABINOWITZ, ROY BAYNES, ROELOF F. BOTHA, ROWAN CHAPMAN, JAMES I. HEALY, GAIL MARCUS, HERM ROSENMAN, JONATHAN SHEENA, MICHAEL BROPHY, PAUL BILLINGS, and  RAMESH HARIHARAN,<br><br>      Defendants,<br><br>  and<br><br>NATERA, INC.,<br><br>      Nominal Defendant. | Case No.:<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Guillermo Rowe ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Natera, Inc. ("Natera" or the "Company"), files this Shareholder Derivative Complaint against Defendants Steve Chapman ("S. Chapman"), Matthew Rabinowitz ("Rabinowitz"), Roy Baynes ("Baynes"), Roelof F. Botha ("Botha"), Rowan Chapman ("R. Chapman"), James I. Healy ("Healy"), Gail Marcus ("Marcus"), Herm Rosenman ("Rosenman"), Jonathan Sheena ("Sheena"), Michael Brophy ("Brophy"), Paul Billings ("Billings"), and Ramesh Hariharan ("Hariharan") (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Natera.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Natera, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Western District of Texas captioned *Schneider v. Natera, Inc., et al.*, 1:22- cv-00398-DAE (W.D. Tex.) (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Natera against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from February 26, 2020 to March 14, 2022 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Natera and its shareholders, including monetary losses and damages to Natera's reputation and goodwill.

2.      Natera is a diagnostics company that develops and commercializes molecular testing services worldwide. Its products include "Panorama," a non-invasive prenatal test ("NIPT") that screens for chromosomal abnormalities of a fetus, as well as providing screening tests for kidney transplant failure called "Prospera." Panorama assesses cell-free DNA ("cfDNA") from a pregnant woman's bloodstream to determine whether her baby is at heightened risk for certain genetic conditions.

2

3.      This complaint arises from Natera representing to investors that Panorama was reliable, that Prospera was more accurate than competing tests, and that Natera's growth was driven by its superior technology and customer experience.  This, however, was not true.  On January 1, 2022, *The New York Times* reported that Natera's positive results for several genetic disorders were incorrect more than 80 percent of the time causing the price of Natera common stock to fall $5.35 per share over two trading days.

4.      On March 14, 2022, a federal jury determined in *CareDx, Inc. v. Natera, Inc.*, No. 19-cv-662- CFC-CJB (D. Del.), that Natera had intentionally and knowingly misled the public by using false advertisements to market Prospera in violation of the federal Lanham Act, the Delaware Deceptive Trade Practices Act, and Delaware common law.  The jury awarded CareDx $44.9 million in monetary damages, which included $23.7 million in punitive damages. On this news, Natera common stock fell as much as $8.81 per share, or approximately 22.5%, from an intra-day high of $39.13 per share on March 14, 2022, to close at $30.32 per share on March 15, 2022.

5.      On April 19, 2022, the FDA issued a safety communication "to educate patients and health care providers and to help reduce the inappropriate use of [NIPT]." The FDA expressed concern that many NIPT providers represent that their tests are "reliable" and "highly accurate," noting that "these claims may not be supported with sound scientific evidence."  On this news, the price of Natera common stock fell as much as $1.53 per share, or approximately 3.9%, from an intra-day high of $39.63 per share on April 19, 2022, to close at $38.10 per share on April 20, 2022.

6.      Making matters worse and before investors and the public learned of this crushing news, six of the Defendants, S. Chapman, Rosenman, Botha, Rabinowitz, Sheena, and

Brophy (collectively "Insider Trading Defendants"), sold nearly 2 million shares for over $164 million while in possession of non-public information related to, among other things, Panorama's questionable reliability and Prospera's lack of superior accuracy.

7.      As a result of the foregoing, Natera, its chief executive officer, its chief financial officer, its executive chairman, and its general manager of women's health division have been named defendants in the Securities Action by investors who allege they were damaged when they purchased Natera shares during the Relevant Period.

8.      The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. It will likely cost the Company millions of dollars going forward.

9.      On September 11, 2023, the court in the Securities Class Action denied the Securities Action Defendants' motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Securities Class Action has exposed the Company to massive class-wide liability.

10.     To make matters worse, as the Company's share price declined, members of the Board approved their own improper and grossly excessive compensation without meaningful limits or controls, and without regard for the Company's stock price, revenue, and market capitalization.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act (the "Exchange Act") and Rule 14a-9 of the Exchange Act.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Natera is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Natera, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

15.     Plaintiff is a current shareholder of Natera common stock. Plaintiff has continuously held common stock at all relevant times.

### Nominal Defendant

5

16.     Defendant Natera is incorporated under the laws of Delaware, with its principal executive offices located at 13011 McCallen Pass, Building A Suite 100, Austin, Texas 78753. Natera common stock trades on the NASDAQ under the symbol "NTRA."

**Defendants**

17.     Defendant Steve Chapman ("S. Chapman") is the Company's CEO and also serves as a member of the Board.  S. Chapman joined Natera in 2010 as Vice President of Sales, later becoming Chief Commercial Officer and then Chief Operating Officer. As COO, S. Chapman led the Company's commercial entry into the NIPT market. S. Chapman was appointed CEO in January 2019, and, according to Natera, "has been instrumental" in extending Natera's "core technology [and] achieving rapid commercial growth for the Prospera™ transplant assessment test."

18.     During the Relevant Period, Defendant S. Chapman made the following sales of stock:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/10/2022 | 1,147 | $42.16 | $48,358 |
| 1/24/2022 | 3,686 | $59.95 | $220,961 |
| 1/5/2022 | 4,995 | $82.61 | $412,637 |
| 1/3/2022 | 29,167 | $88.27 | $2,574,564 |
| 12/28/2021 | 2,604 | $91.34 | $237,849 |
| 12/23/2021 | 1,657 | $93.00 | $154,097 |
| 12/10/2021 | 1,145 | $91.33 | $104,573 |
| 12/7/2021 | 4,726 | $91.99 | $434,754 |
| 12/1/2021 | 7,219 | $90.80 | $655,454 |
| 11/1/2021 | 6,652 | $115.64 | $769,221 |
| 10/4/2021 | 21,157 | $108.18 | $2,288,781 |
| 9/28/2021 | 2,698 | $109.72 | $296,012 |
| 9/23/2021 | 28,563 | $119.43 | $3,411,189 |
| 9/10/2021 | 90,968 | $119.71 | $10,890,042 |
| 8/12/2021 | 33,356 | $101.66 | $3,391,041 |
| 7/6/2021 | 32,465 | $117.18 | $3,804,301 |
| 6/28/2021 | 2,604 | $117.57 | $306,156 |

| | | | |
|---|---|---|---|
| 6/23/2021 | 1,662 | $115.18 | $191,424 |
| 6/14/2021 | 26,092 | $103.61 | $2,703,397 |
| 6/10/2021 | 1,158 | $102.61 | $118,817 |
| 6/4/2021 | 4,709 | $97.51 | $459,160 |
| 5/14/2021 | 13,007 | $93.05 | $1,210,251 |
| 4/13/2021 | 41,650 | $104.21 | $4,340,451 |
| 4/5/2021 | 1,558 | $104.09 | $162,172 |
| 3/29/2021 | 11,476 | $83.95 | $963,411 |
| 3/22/2021 | 2,241 | $102.55 | $229,804 |
| 3/11/2021 | 17,922 | $99.63 | $1,785,533 |
| 3/8/2021 | 51,399 | $97.94 | $5,033,779 |
| 3/3/2021 | 1,390 | $115.00 | $159,850 |
| 2/1/2021 | 3,840 | $108.12 | $415,179 |
| 1/13/2021 | 8,155 | $115.00 | $937,825 |
| 1/4/2021 | 4,890 | $99.49 | $486,506 |
| 12/23/2020 | 1,649 | $110.83 | $182,759 |
| 12/22/2020 | 5,056 | $105.48 | $533,282 |
| 12/10/2020 | 1,163 | $92.60 | $107,691 |
| 11/10/2020 | 130,000 | $77.90 | $10,126,352 |
| 11/4/2020 | 61,351 | $75.00 | $4,601,325 |
| 10/12/2020 | 210 | $75.00 | $15,750 |
| 10/5/2020 | 11,185 | $71.24 | $796,819 |
| 9/22/2020 | 2,218 | $63.15 | $140,076 |
| 9/10/2020 | 1,184 | $60.77 | $71,955 |
| 9/4/2020 | 9,720 | $61.56 | $598,374 |
| 8/6/2020 | 61,565 | $55.00 | $3,386,075 |
| 7/2/2020 | 13,237 | $48.97 | $648,268 |
| 6/24/2020 | 4,771 | $45.47 | $216,955 |
| 6/22/2020 | 41,025 | $45.10 | $1,850,326 |
| 6/15/2020 | 8,914 | $42.85 | $381,995 |
| 6/9/2020 | 17,304 | $39.75 | $687,796 |
| 4/3/2020 | 1,564 | $27.50 | $43,009 |
| 3/23/2020 | 7,424 | $24.10 | $178,887 |
| 3/10/2020 | 1,147 | $33.36 | $38,264 |
| **Total Shares Sold** | 846,645 | **Total Proceeds** | $73,803,507 |

19.     Defendant Matthew Rabinowitz ("Rabinowitz") is a co-founder of Natera and serves as Chairman of the Board. Rabinowitz served as Natera's CEO from 2005 through 2018, when S. Chapman was appointed CEO, effective January 8, 2019. In connection with the announcement of Rabinowitz transitioning to Executive Chairman, Natera stated, "Rabinowitz

will remain integrally involved as Executive Chairman focusing on the company's long-term business strategy and technology innovation."

20.    During the Relevant Period, Defendant Rabinowitz made the following sales of stock:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 10/14/2021 | 122 | $112.19 | $13,687 |
| 9/23/2021 | 159 | $125.67 | $19,982 |
| 9/10/2021 | 876 | $119.53 | $104,707 |
| 7/14/2021 | 76 | $116.20 | $8,831 |
| 6/23/2021 | 99 | $115.18 | $11,403 |
| 6/10/2021 | 698 | $102.60 | $71,617 |
| 4/14/2021 | 76 | $108.54 | $8,249 |
| 3/23/2021 | 101 | $101.72 | $10,274 |
| 3/10/2021 | 766 | $97.31 | $74,537 |
| 2/1/2021 | 212 | $107.40 | $22,769 |
| 12/10/2020 | 996 | $92.59 | $92,218 |
| 11/9/2020 | 250,000 | $78.92 | $19,730,745 |
| 10/14/2020 | 108 | $73.45 | $7,933 |
| 10/5/2020 | 250,000 | $71.62 | $17,905,981 |
| 9/23/2020 | 141 | $63.31 | $8,926 |
| 9/10/2020 | 1,014 | $60.77 | $61,622 |
| 7/14/2020 | 108 | $45.98 | $4,966 |
| 6/23/2020 | 142 | $45.51 | $6,463 |
| 6/15/2020 | 976 | $41.90 | $40,894 |
| 3/23/2020 | 579 | $24.09 | $13,946 |
| 3/10/2020 | 1,107 | $33.36 | $36,930 |
| **Total Shares Sold** | 508,356 | **Total Proceeds** | $38,256,680 |

21.    Defendant Roy Baynes ("Baynes") has served as a member of the Board since July 2018. Baynes is Chief Medical Officer at Merck, and Senior Vice President and Head of Global Clinical Development at Merck Research Laboratories. Baynes was previously Senior Vice President of Oncology, Inflammation, and Respiratory Therapeutics at Gilead Sciences, and also served as Vice President of Global Clinical Development and Therapeutic Area Head for Hematology/Oncology at Amgen.

8

22.     Defendant Roelof F. Botha ("Botha") has served as a member of the Board since 2007. Botha has been with Sequoia Capital, a venture capital firm, since 2003, and has been a Managing Member of Sequoia Capital Operations, LLC since 2007.

23.     During the Relevant Period, Defendant Botha made the following sales of stock:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/14/2021 | 67,887 | $93.60 | 6,353,885 |
| **Total Shares Sold** | 67,887 | **Total Proceeds** | $6,353,885 |

24.     Defendant Rowan Chapman ("R. Chapman") has served as a member of the Board since August 2019. R. Chapman has held senior roles as Head of Johnson & Johnson Innovation, Western North America, 10 Australia and New Zealand, and as Head of Precision Diagnostics at GE Healthcare Life Sciences, Managing Director of New Business Creation, and Head of Healthcare Investing at GE Ventures.

25.     Defendant James I. Healy ("Healy") has served as a member of the Board since November 2014. Healy has been a General Partner at Sofinnova Ventures, a venture capital firm, since 2000.

26.     Defendant Gail Marcus ("Marcus") has served as a member of the Board since March 2017. Marcus was a healthcare executive across a diverse portfolio of healthcare organizations in the US and UK, including Cigna, UnitedHealthcare Group Inc., CVS/Caremark, and Caris Diagnostics of Caris Life Sciences.

27.     Defendant Herm Rosenman ("Rosenman") has served as a member of the Board since February 2017 and served as the Company's Chief Financial Officer from February 2014 to January 2017.

28.     During the Relevant Period, Defendant Rosenman made the following sales of

stock:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/8/2021 | 44,503 | 117.39 | 5,224,302 |
| **Total Shares Sold** | 44,503 | **Total Proceeds** | $5,224,302 |

29.     Defendant Jonathan Sheena ("Sheena") is a co-founder of Natera and has served as a member of the Board since 2007.

30.     During the Relevant Period, Defendant Sheena made the following sales of stock:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/10/2022 | 694 | $42.16 | $29,259 |
| 1/24/2022 | 208 | $59.95 | $12,469 |
| 12/28/2021 | 202 | $91.34 | $18,451 |
| 12/23/2021 | 204 | $92.99 | $18,970 |
| 12/10/2021 | 1,050 | $91.33 | $95,897 |
| 9/28/2021 | 209 | $109.71 | $22,930 |
| 9/23/2021 | 204 | $125.67 | $25,637 |
| 9/10/2021 | 1,030 | $119.53 | $123,114 |
| 8/30/2021 | 17,859 | $121.18 | $2,164,157 |
| 7/22/2021 | 1,352 | $121.82 | $164,702 |
| 7/9/2021 | 6,916 | $121.09 | $837,475 |
| 6/25/2021 | 1,740 | $121.13 | $210,757 |
| 6/23/2021 | 205 | $115.18 | $23,611 |
| 6/16/2021 | 19,000 | $101.77 | $1,933,573 |
| 6/10/2021 | 1,034 | $102.60 | $106,090 |
| 4/13/2021 | 3,213 | $104.21 | $334,835 |
| 3/29/2021 | 586 | $83.95 | $49,194 |
| 3/22/2021 | 469 | $104.06 | $48,806 |
| 3/10/2021 | 703 | $97.32 | $68,416 |
| 2/25/2021 | 1,038 | $106.69 | $110,746 |
| 12/10/2020 | 1,038 | $92.60 | $96,116 |
| 6/30/2020 | 92,115 | $49.44 | $4,554,221 |
| 6/22/2020 | 705 | $46.19 | $32,564 |
| 6/10/2020 | 1,023 | $42.19 | $43,160 |
| 5/12/2020 | 7,885 | $49.05 | $386,746 |
| 5/7/2020 | 100,000 | $43.44 | $4,344,405 |
| 3/23/2020 | 897 | $24.10 | $21,617 |

| | | | |
|---|---|---|---|
| 3/10/2020 | 800 | $33.36 | $26,688 |
| **Total Shares Sold** | 262,379 | **Total Proceeds** | $15,904,606 |

31.     Defendant Micahel Brophy ("Brophy") has served as Natera's CFO since February 1, 2017 and previously served as Senior Vice President of Finance and Investor Relations starting in September 2016. Prior to that, Brophy served as the Company's Vice President of Corporate Development and Investor Relations.

32.     During the Relevant Period, Defendant Brophy made the following sales of stock:

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/10/2022 | 1,197 | $42.16 | $50,466 |
| 1/24/2022 | 1,275 | $59.95 | $76,431 |
| 12/28/2021 | 914 | $91.34 | $83,485 |
| 12/23/2021 | 429 | $93.00 | $39,895 |
| 12/10/2021 | 1,196 | $91.33 | $109,231 |
| 12/7/2021 | 3,501 | $91.99 | $322,064 |
| 11/10/2021 | 25,495 | $111.14 | $2,833,421 |
| 9/27/2021 | 25,947 | $114.65 | $2,974,936 |
| 9/23/2021 | 427 | $125.67 | $53,661 |
| 9/10/2021 | 6,188 | $119.53 | $739,642 |
| 6/28/2021 | 914 | $117.57 | $107,460 |
| 6/23/2021 | 430 | $115.18 | $49,526 |
| 6/10/2021 | 1,209 | $102.61 | $124,050 |
| 6/4/2021 | 3,489 | $97.51 | $340,202 |
| 5/18/2021 | 20,807 | $93.30 | $1,941,262 |
| 4/22/2021 | 3,213 | $110.14 | $353,870 |
| 4/13/2021 | 14,616 | $104.21 | $1,523,170 |
| 3/29/2021 | 4,027 | $83.96 | $338,115 |
| 3/22/2021 | 884 | $103.40 | $91,409 |
| 3/16/2021 | 2,234 | $110.23 | $246,254 |
| 3/10/2021 | 5,954 | $97.31 | $579,394 |
| 2/25/2021 | 1,899 | $106.73 | $202,683 |
| 12/23/2020 | 78,341 | $110.47 | $8,653,933 |
| 12/22/2020 | 5,208 | $105.48 | $549,314 |
| 12/10/2020 | 1,214 | $92.59 | $112,403 |
| 10/22/2020 | 1,626 | $68.72 | $111,734 |

| | | | |
|---|---|---|---|
| 9/22/2020 | 3,172 | $63.18 | $200,419 |
| 9/10/2020 | 1,236 | $60.77 | $75,115 |
| 9/4/2020 | 7,200 | $61.56 | $443,263 |
| 8/24/2020 | 1,626 | $65.55 | $106,576 |
| 7/22/2020 | 1,626 | $49.03 | $79,723 |
| 6/24/2020 | 10,021 | $45.77 | $458,635 |
| 6/22/2020 | 3,176 | $45.65 | $144,970 |
| 6/9/2020 | 10,273 | $39.88 | $409,684 |
| 5/22/2020 | 3,251 | $45.45 | $147,752 |
| 5/7/2020 | 833 | $40.00 | $33,320 |
| 4/6/2020 | 2,251 | $29.01 | $65,302 |
| 3/23/2020 | 1,381 | $24.10 | $33,286 |
| 3/10/2020 | 787 | $33.36 | $26,254 |
| 3/2/2020 | 2,725 | $37.97 | $103,463 |
| 2/27/2020 | 200 | $40.00 | $8,000 |
| **Total Shares Sold** | 262,392 | **Total Proceeds** | $24,943,773 |

33.     Defendant Paul Billings ("Billings") served as Natera's CMO and Senior Vice President of Medical Affairs from April 2018 until his resignation in December 2021.

34.     Defendant Ramesh Hariharan ("Hariharan") has served as Natera's General Manager of the Women's Health Division since 2019.

**Relevant Non-Party**

35.     Non-party Ruth E. Williams-Brinkley has served as a member of the Board since 2023.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers, directors, and/or fiduciaries of Natera and because of their ability to control the business and corporate affairs of Natera, the Individual Defendants owed Natera and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage Natera in a fair, just, honest, and equitable manner. The Individual

Defendants were and are required to act in furtherance of the best interests of Natera and its shareholders to benefit all shareholders equitably.

37.     Each director and officer of the Company owes Natera and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

38.     As fiduciaries of Natera, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

39.     The officers and directors of Natera were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

40.     Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. As Natera's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

41.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the

common stock price would be based on accurate information and to preclude deceptive practices in the market.

42.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, the United States, and pursuant to Natera's Code of Conduct and internal guidelines;

b)     Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)     Remain informed as to how Natera conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection in addition to that and to take steps to correct such conditions or practices;

d)     Establish and maintain systematic, accurate records and reports of the business and internal affairs of Natera and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Natera's operations would comply with all laws and Natera's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f) Exercise reasonable control and supervision over Company's officers and employees' public statements and any other reports or information that the Company was required by law to disseminate;

g) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h) Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

43. Each of the Individual Defendants further owed Natera and the shareholders the duty of loyalty, which requires that each favor Natera's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

44. At all times relevant hereto, the Individual Defendants were the agents of each other and Natera and were at all times acting within the course and scope of such agency.

45. The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial positions with Natera.

46. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Natera.

### A. Natera's Code of Conduct

47. The Individual Defendants, like all employees, directors, and officers of the

Company, are required to comply with Natera's Code of Conduct (the "Code of Conduct"). The

Code of Conduct states, in pertinent part, the following:

> Our tests have touched the lives of millions of people. We recognize the privilege we have in providing critical information to individuals and their families at some of life's most important moments. We also understand that there is 'a person behind every sample'—a mother, a father, a teacher, a friend. They all rely on us to operate from a strong ethical foundation and ensure that integrity is the cornerstone of each interaction. Following the Code of Conduct is a daily commitment we make to our patients, healthcare partners, colleagues and shareholders. Doing so is paramount to earn and maintain their trust. It is our responsibility to live by these policies, and it's also the right thing to do.

> \* \* \*

> **Honesty and Integrity**

> We are committed to providing outstanding service and conducting our business honestly and with integrity. We keep our commitments to each other, to our customers, and to our partners. We endeavor to communicate in an honest and unambiguous way, and to avoid making any misstatements of fact, making misleading or exaggerated communications, or creating false impressions. We are open and transparent, committed to complying with governing laws, rules and regulations. Natera will not misinform, misrepresent, or otherwise make unsubstantiated claims about the products or services provided. We are committed to preventing unethical or unlawful behavior, to halt any such behavior as soon as it is identified and to implement corrective action.

> Natera employees are expected to behave honestly and with integrity. An employee should never use Natera assets for any unlawful or unethical purposes, nor make any payments to third parties for any purpose other than that shown in Natera's records. Offering something of value to a government employee to influence a government decision, obtain business or keep business is illegal and against Natera policy. This could include offers of cash, gifts, complementary health services or even job opportunities. Any requests from third parties for gifts, payments or other inappropriate remuneration should be reported to the Compliance Department.

> **Business and Financial Records**

> We maintain accurate and complete business and financial records. We create and maintain financial records in accordance with applicable legal requirements and generally accepted accounting practices. Our SEC reports, disclosures, and other public communications must be full, fair, accurate, timely, and understandable. Although financial reporting and controls are especially applicable to members of

Natera's Finance Department, we are each responsible for complying with all financial controls and policies. We each acknowledge our responsibility to make sure that appropriate Finance Department personnel are made aware in a timely manner of any fact or issue that might have a material impact on our financial statements or disclosures.

* * *

**Insider Trading**

We conduct our business in a truthful, open manner. Federal law and Natera's Insider Trading Policy prohibit both trading on the basis of material nonpublic information and "tipping" others by providing material nonpublic information to them and may result in criminal prosecution. Material nonpublic information is information that has not been released to the public and which a reasonable investor would find useful in determining whether to buy or sell stock, e.g., financial results, sales results, acquisitions, customer wins or losses, or changes in senior management. We do not buy or sell stock on the basis of material nonpublic information, or pass such information to any others, including friends or family.

### B.  Audit Committee Charter

48.      In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Rosenman (Chair), R. Chapman, Healy and Marcus ("Audit Committee Defendants") owed specific additional duties to Natera. The Audit Committee, pursuant to its Charter, is responsible for assisting the Board in overseeing the financial reporting processes on behalf of the Board and reporting the results of its activities to the Board and preparation and certification of the Company's financial statements to guarantee the independent auditors' report, or to guarantee other disclosures by the Company, among other things:

### A.  Purpose

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Natera, Inc. (the "Company") is to assist the Board with its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the qualifications, independence, and performance of the Company's independent registered public accounting firm (the "independent auditor"), (iv) the design and implementation of the Company's internal audit function, if and when implemented, and (v) risk assessment and risk management. The Committee is also

responsible for preparing the report required by the Securities and Exchange Commission (the "Commission") rules to be included in the Company's proxy statement for the annual meeting of stockholders. This Charter sets forth the composition, authority, and responsibilities of the Committee.

***

## C.  Responsibilities & Duties

The principal responsibilities and duties of the Committee in serving the purposes outlined in "Purpose" above are set forth below. These duties are set forth as a guide with the understanding that the Committee will carry them out in a manner that is appropriate given the Company's needs and circumstances. The Board or Committee may supplement them as appropriate and may establish policies and procedures from time to time that it deems necessary or advisable in fulfilling its responsibilities.

### 1.   Select and Hire the Independent Auditor

Be directly responsible for appointing, compensating, retaining, overseeing and, where appropriate, replacing the independent auditor engaged for the purpose of preparing or issuing an audit report or performing other audit, review, or attest services for the Company.  The independent auditor will report directly to the Committee. The Committee has sole authority to approve the hiring and discharging of the independent auditor, all audit engagement fees and terms, and all permissible non-audit engagements with the independent auditor. Although the Committee has the sole authority to appoint the independent auditor, the Committee will recommend that the Board ask the shareholders of the Company, at their annual meeting, to ratify the Committee's selection of the independent auditor.

### 2. Supervise and Evaluate the Independent Auditor

• Oversee and, at least annually, evaluate the qualifications and performance of the independent auditor engaged for the purpose of preparing or issuing an audit report or performing other audit, review, or attest services for the Company, which evaluation shall include a review and evaluation of the lead partner of the independent auditor. In making its evaluation, the Committee should take into account the opinions of management and the Company's internal auditors (or other personnel responsible for the internal audit function).

• Review and resolve any disagreements that may arise between management and the independent auditor regarding financial reporting or internal control over financial reporting.

• At least annually, obtain and review a report by the independent auditor that

describes (i) the independent auditor's internal quality control procedures, and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding any independent audit performed by the independent auditor, and any steps taken to deal with any such issues.

**3. Evaluate the Independence of the Independent Auditor**

• At least annually, obtain and review a formal written statement from the independent auditor delineating all relationships between the independent auditor and the Company, and review and discuss with the independent auditor any disclosed relationships or services that may impact the objectivity and independence of the independent auditor.

• Review and discuss with the independent auditor, at least annually, any relationships or services (including permissible non-audit services) that may affect its objectivity and independence.

• Oversee the rotation of the independent auditor's lead audit and concurring partners, and the rotation of other audit partners, with applicable time-out periods, in accordance with applicable law.

• Consider, on a periodic basis, whether, in order to assure continuing auditor independence, there should be a regular rotation of the independent auditing firm.

• Take appropriate action to oversee the independence of the independent auditor.

**4. Approve Audit and Non-Audit Services and Fees**

• Review and approve, in advance, the scope and plans for the audits and the audit fees.

• Approve in advance (or, where permitted under the rules and regulations of the Commission, subsequently) all non-audit and tax services to be performed by the independent auditor that are not otherwise prohibited by law or regulations and any associated fees.

The Committee shall also approve all audit, non-audit, and tax services that may be provided by other registered public accounting firms. The Committee may, in accordance with applicable law, establish pre-approval policies and

procedures for the engagement of independent accountants to render services to the Company.

## 5. Review Financial Statements

Review and discuss the following with management, the internal auditors, and the independent auditor, as applicable:

- The annual audit plan and scope of audit activities and monitor such plan's progress.

- The scope and timing of the annual audit of the Company's financial statements.

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Forms 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

- The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the audited financial statements.

- The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

- Major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the

auditor's activities or on access to requested information, and management's response.

• Any significant disagreements between management and the independent auditor.

### 6. Reports and Communications from the Independent Auditor

Review and discuss reports from the independent auditor, including any matters required to be communicated to the Committee under generally accepted auditing standards and other legal or regulatory requirements.

### 7. Financial Activities

Review and oversee the Company's cash management, investing activities, and tax planning and compliance, and approve policies related to these matters, if any.

### 8. Audit Committee Report

Prepare the report of the Committee that Commission rules require to be included in the Company's proxy statement for the annual meeting of stockholders.

### 9. Earnings Press Releases and Earnings Guidance

Review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases and the type and presentation of information to be included therein (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts, and rating agencies.

### 10. Internal Controls

Review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

### 11. Disclosure Controls and Procedures

Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

### 12. Internal Audit

Review with the independent auditor a discussion of management's plans, if any, with respect to the responsibilities, budget, and staffing of the internal audit function and the Company's plans for the implementation of the internal audit function.

### 13. Legal and Regulatory

Review, with counsel, legal or regulatory matters that could have a material impact on the Company's financial statements.

### 14. Complaints

Establish and oversee procedures for the receipt, retention, and treatment of complaints received by the Company reporting accounting, internal accounting controls, or auditing matters, as well as for confidential and anonymous submissions by the Company's employees concerning questionable accounting or auditing matters.

### 15. Risk Assessment and Risk Management

Oversee the management of risks associated with the Company's financial reporting, accounting, auditing and information security (including cybersecurity) matters, including the Company's guidelines and policies with respect to risk assessment and risk management.

### 16. Related Party Transactions

Review and oversee all transactions between the Company and a related person (as defined in Item 404 of Regulation S-K), in accordance with the Company's policies and procedures.

### 17. Company Hiring of Auditor Personnel

Set hiring policies with regard to the Company hiring employees and former employees of the independent auditor and oversee compliance with such policies.

### 18. Committee Charter Review

Review and reassess the adequacy of this charter annually and will submit any recommended changes to the charter to the Board for approval.

**19. Performance Review**

Review and evaluate the performance of the Committee on an annual basis.

49.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Natera, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company already incurred, Natera has needlessly expended, and will continue to needlessly expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate

applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of here because the action described herein occurred under the authority and approval of the Board.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Natera and was at all times acting within the course and scope of such agency.

## **FACTUAL BACKGROUND**

55.     Natera, headquartered in Austin, Texas as a Delaware corporation, specializes in genetic testing within the realms of women's health, oncology, and organ wellness. Their product lineup includes Panorama (a Non-Invasive Prenatal Test or NIPT) and Prospera (a screening tool for kidney transplant viability). The company's technology assesses single nucleotide polymorphisms ("SNPs"), the most prevalent form of genetic variation found in individuals.

56.     Panorama examines cell-free DNA ("cfDNA") obtained from a pregnant woman's bloodstream to ascertain whether her baby carries an elevated risk for specific genetic conditions. It primarily screens for fetal chromosomal abnormalities, encompassing Down

syndrome, Edwards syndrome, Patau syndrome, Turner syndrome, and triploidy, which may lead to intellectual disability, severe organ malformations, and potential miscarriage. Additionally, Panorama offers the option to determine the baby's gender. Furthermore, healthcare providers may choose to include a microdeletions panel with Panorama, which screens for various genetic disorders arising from the absence of sub-chromosomal DNA segments, such as DiGeorge syndrome, Angelman syndrome, Cri-du-chat syndrome, and Prader-Willi syndrome.

57.     As of the close of 2017, Natera asserted its position as the foremost leader in the United States' Non-Invasive Prenatal Testing (NIPT) market in terms of volume. In November 2021, S. Chapman informed analysts that Natera's slice of the NIPT market was nearing 40%. He stated, "[W]e meticulously monitor our market share and conduct comprehensive market surveys, allowing us to gauge our competitive position. Notably, we have been progressively increasing our share compared to the broader market."

58.     Natera's primary Non-Invasive Prenatal Test (NIPT), Panorama, is designed to detect fetal chromosomal abnormalities. Utilizing a blood sample from an expectant mother, Panorama scrutinizes DNA from the placenta, identifying specific chromosome conditions that could potentially affect the baby's health. This process can be conducted as early as the ninth week of pregnancy. Throughout the relevant period, Panorama screened for various aneuploidies, which involve the presence of an extra or missing copy of a chromosome, including Down syndrome. At an additional cost, Panorama also offered screening for five exceedingly rare microdeletion syndromes, one of which was DiGeorge syndrome. Microdeletions pertain to small, absent segments of a chromosome. Natera invoiced separately for aneuploidy and microdeletion screening. Consequently, when a patient's Panorama test encompassed both types of screening, Natera billed distinct costs for each, thereby generating revenue from both.

59.     During the Relevant Period, the Individual Defendants informed investors that a significant portion of Natera's positive revenue performance was attributed to Panorama. According to Natera's reports in 2019, 2020, and 2021, Panorama, along with another test, represented the majority of the company's revenues. Simultaneously, the Individual Defendants emphasized what they claimed was a natural surge in demand for Panorama, including for microdeletion testing. However, these assertions were, in fact, materially false or misleading as the revenue and demand for Panorama were substantially influenced by deceptive business practices, as discussed below.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

60.     On the date of February 26, 2020, the Company publicly announced its financial results for both the fourth quarter and the entirety of 2019. Within this announcement, Natera revealed its revenue figures for 2019, which amounted to a noteworthy $302.3 million. This represented a significant year-over-year growth exceeding 17%. These reported figures exceeded the general market predictions, which had been set at $296.8 million. In the press release announcing these results, Defendant S. Chapman highlighted that 2019 was a "transformational year for Natera." He credited this success to "excellent data, securing coverage decisions, and signing significant commercial partnerships." Moreover, S. Chapman declared Natera's robust capability to maintain this growth trend, projecting it to continue through 2020 and beyond.

61.     On March 2, 2020, the Company filed its annual report for the fiscal year concluding on December 31, 2019, with the SEC, utilizing Form 10-K, referred to as the "2019 Annual Report". This report, asserted that Natera's technology "has been proven clinically and commercially in the reproductive health space, in which we develop and commercialize non- or minimally- invasive tests to evaluate risk for, and thereby enable early detection of, a wide range

of genetic conditions, such as Down syndrome." Additionally, the Individual Defendants caused the 2019 Annual Report to represent that Panorama is "overall the most accurate NIPT commercially available in the United States."

62.     Throughout the Relevant Period, the Individual Defendants consistently advocated for the reliability of Panorama. For example, during an earnings discussion on May 6, 2020, Defendant S. Chapman described Panorama as "a highly technically differentiated product" with "multiple unique clinical features that are unmatched by our competitors." Chapman also mentioned ongoing studies, such as the SMART study, which evaluated Panorama's performance in routine clinical care over five years, and anticipated its results, due in 2020, to significantly influence the market growth for Panorama.

63.     In the Company's earnings call on August 5, 2020, Defendant S. Chapman reiterated Panorama's supposed accuracy and success. He stated the Company "continue[s] to push out evidence that shows [Panorama's] unique aspects" and that "physicians now recognize us as both the clinical and market leader" in NIPT.

64.     On October 29, 2020, Natera announced a significant coverage extension by Humana for NIPT. Defendant Hariharan commented on this expansion, noting that "[t]he average risk NIPT market still remains highly underpenetrated," and expressed confidence in Panorama's "unique SNP-based clinical advantages" for market opportunities.

65.     In the November 5, 2020 earnings call, Defendant S. Chapman labeled Natera's SMART study as "the gold standard in NIPT and the gold standard in microdeletions," with potential to influence societal guidelines and insurance coverage for Panorama. He also stressed the Company's focus on "improving NIPT and . . . delivering [awesome] user experience" to dominate the Women's Health market segment.

66.     On December 1, 2020, Natera reported coverage extension of NIPT by the largest U.S. health plan. In the press release, Defendant Hariharan claimed that "[a]s the market leader, Natera is in a strong position to capitalize on the significant volume growth opportunity and improved test economics resulting from these policy changes."

67.     Two days later, on December 3, 2020, Natera announced further NIPT coverage by the second-largest U.S. insurer. The Individual Defendants emphasized the company's advantageous position with Defendant Hariharan noting that "all 20 of the largest commercial payors now cover NIPT, independent of prior risk," and stating that, "[w]ith [Natera's] unique SNP-based NIPT, we will have an even greater opportunity to make a positive impact on prenatal care."

68.     In a February 25, 2021 earnings call, Defendant S. Chapman highlighted the fourth quarter of 2020 as "the best quarter we've ever had at Natera," attributing this success largely to Panorama and the expanded insurance coverage for NIPT. He further stated, "Panorama is the market leading NIPT" with "best in class performance and differentiated clinical value."

69.     During the same call, S. Chapman disclosed the SMART study results as "even stronger than expected," placing Natera in a favorable position for reimbursement for its microdeletions tests and for gaining market share in NIPT. He described microdeletion screening as "a rocket ship that's growing," with potential for significant revenue impact upon reimbursement. The Individual Defendants assured investors of the study's validation of Panorama's performance.

70.     On February 26, 2021, the Company filed its "2020 Annual Report" with the SEC. The 2020 Annual Report reiterated Panorama's high accuracy, stating superior performance over competitors in terms of sensitivity and specificity for various screenings, and emphasized

its capability in identifying fetal sex more accurately than competing NIPTs.

71.     The 2020 Annual Report also discussed Prospera, highlighting its high accuracy in challenging transplant cases and superior precision compared to rival tests.

72.     At the SVB Leerink Global Healthcare Conference on February 26, 2021, Defendant S. Chapman responded to an analyst's query about Natera's future in the NIPT market. He claimed Panorama had "the most significant body of evidence" backing it and that the SMART study was "the most robust validation study that's ever been done where the performance of our test held up." S. Chapman emphasized Panorama's unique qualities and extensive peer-reviewed data, foreseeing accelerated market penetration and share growth.

73.     In the May 6, 2021 earnings call, S. Chapman reported continued acceleration in growth rates, driven by strong performance in the Women's Health business and contributions from oncology and organ health sectors.

74.     S. Chapman, in the same call, affirmed the superior sensitivity and specificity of Panorama, particularly for trisomy 21, and its differentiation from other NIPTs. He also discussed the reliability and prospects of Panorama's microdeletions panel, forecasting significant revenue and impact upon reimbursement.

75.     During the August 5, 2021 earnings call, S. Chapman informed investors of Natera's rapid growth in volumes and revenues, surpassing previous forecasts. He highlighted Natera's success in processing tests and the significant growth in women's health products, attributing part of this success to the SMART trial data.  Specifically, S. Chapman stated:

> [S]ome of the big academic centers and maternal fetal medicine practices that hadn't been using [Panorama] before considering a switch are now looking at that data and they're excited about it, because this type of -- this quality of [data] hasn't been produced before. So . . . we are having competitive wins, but we're also seeing the market penetrate.

76.     S. Chapman projected substantial growth for Natera in the NIPT market, anticipating expansion from 1.5 million to over 4 million annual NIPTs annually in the U.S.

77.     Regarding Prospera, S. Chapman noted its higher accuracy compared to a rival test in identifying transplant rejections and emphasized Prospera's competitive edge based on prospective data.

78.     At Canaccord Genuity's Annual Growth Conference on August 11, 2021, Defendant Brophy expressed optimism about Natera's future growth, driven by technology advancements and increased NIPT market penetration.

79.     On September 9, 2021, Natera launched Prospera Kidney with Quantification, claimed to be the only available cfDNA test offering three specific values. The press release highlighted its improved sensitivity in transplant rejection evaluations.

80.     In the November 4, 2021 earnings call, S. Chapman reiterated Natera's NIPT as "the gold standard" and predicted Prospera's similar trajectory. He assured investors of Natera's strong position against competitive challenges in transplant rejection testing and emphasized the Company's growth driven by women's health, oncology, and transplant products.

81.     The above statements were materially false and misleading, and failed to disclose material adverse facts about the Company's business and operations. Specifically, the Individual Defendants misrepresented and/or failed to disclose that: (1) Panorama's reliability was questionable, leading to a significant number of false positive results; (2) Prospera's precision was not superior when compared to its market competitors; (3) due to the misleading nature of Defendants' claims regarding Natera's technology, the Company faced significant legal and regulatory challenges; (4) Natera's revenue growth was attributable to deceptive sales and billing tactics; and (5) as a consequence of these issues, the Individual Defendants' assertions regarding

30

the Company's operational, financial, and growth aspects were not founded on a reasonable assessment.

## THE TRUTH EMERGES

82.     The reality of the Company's operations began to surface on January 1, 2022, when The New York Times released an in-depth report (the "NYT Report") raising doubts about the accuracy of several NIPTs, including those by Natera. The NYT Report highlighted that "[t]he grave predictions made by those newer tests are usually wrong," and specifically noted that over 80% of Natera's positive results for conditions like DiGeorge and Prader-Willi syndromes were inaccurate. The report pointed out that, in the case of DiGeorge syndrome, Natera's data implied Panorama would generate three times more false positives than actual cases.

83.     The NYT Report also shed light on the significant adverse consequences of these false positives, such as abortions undertaken based on unverified results and intense emotional distress for expectant parents wrongly led to believe their unborn children had incurable genetic conditions.

84.     Furthermore, the NYT Report included insights from various industry authorities, including a former director of the U.S. Food and Drug Administration and genetic experts, who labeled the information from Natera and similar companies about their NIPTs as "misleading" and "purely a marketing thing."

85.     Following this revelation, Natera's stock price suffered a drop of $5.35 per share, or roughly 6%, over two trading days, plummeting from $93.39 per share on December 31, 2021, to $88.04 per share by January 4, 2022.

86.     Despite the allegations in the NYT Report, the Individual Defendants tried to reassure investors about Panorama's dependability. In a press release dated January 3, 2022, they

contested the report's accuracy claims and insisted that Panorama was correct in over 99% of cases. They also maintained that Natera's microdeletion testing's positive

87.     predictive value "compare[s] favorably to historically accepted maternal serum based prenatal screening methods," arguing that the NYT Report overlooked the "important role of screening tests" in identifying "the subset of high risk individuals."

88.     At J.P. Morgan's 40th Annual Healthcare Conference on January 10, 2022, Defendant S. Chapman continued to assert Panorama's reliability, proclaiming that "[o]ne of the things [Natera is] really proud of . . . is that all of our products are supported and driven by real-world peer-reviewed data," including "more than 100 peer-reviewed papers supporting the performance of [Panorama] and that includes studying more than 1.3 million patients across those studies."

89.     Also, at the same event, S. Chapman celebrated Natera's role as a "market leader" in NIPT, attributing this status to four key factors: (1) "having leading-edge technology and constant innovation"; (2) "extreme focus on customer experience and support services"; (3) "being the number one in clinical data and having expert clinical teams"; and (4) "having a broad and talented commercial team and a broad distribution channel."

90.     Regarding transplant rejection testing, Chapman mentioned that "we're seeing great growth off the strength of [Prospera]. We're working with about 50% of the top transplant centers, and we're very pleased with the uptake we've seen."

91.     Then, on January 14, 2022, the Campaign for Accountability, a non-profit watchdog organization, requested the SEC to investigate whether "Natera repeatedly claimed – in marketing materials and earnings calls – that [its] tests are much more reliable than it appears they really are."

92.     This development led to a further decline in Natera's stock price by $6.29 per share, or over 9%, falling from $67.37 per share on January 14, 2022, to $61.08 per share on January 18, 2022.

93.     Despite the complaint by the Campaign for Accountability, the Individual Defendants continued to promote Natera's testing accuracy and positive customer experiences as key growth drivers. At the 11th Annual SVB Leerink Global Healthcare Conference on February 16, 2022, Defendant S. Chapman reiterated Natera's position as "the market leader" in NIPT, boasting of "the most patients studied in clinical trials," and expressing confidence in riding the wave of market penetration for the next three years.

94.     In the same conference, Chapman also noted the Company's success in kidney transplant testing, highlighting continued growth and deepening penetration into major institutions nationwide.

95.     On February 17, 2022, Natera publicized the results of a study affirming the effectiveness of its Prospera donor-derived cell-free DNA (dd-cfDNA) test for kidney transplant patients. Defendants announced that in the study, "[e]ighteen of the 28 patients with biopsy-matched high-risk . . . test results were confirmed to have active rejection, demonstrating a reported 64% positive predictive value (PPV)."

96.     In the Company's quarterly conference call on February 24, 2022, Defendant S. Chapman again emphasized Panorama's accuracy, stating:

> Panorama test results were accurate[] greater than 99.9% of the time, meaning that 99.9% of the time the Panorama result[,] whether high risk or low risk[,] was confirmed to be correct. For high-risk results only we had a positive predictive value or PPV of 53% meaning that more than 1 in 2 pregnancies screening high risk with Panorama were confirmed to be effective, using a confirmatory diagnostic test. This is really strong, especially compared to traditional prenatal test[s] . . . offered routinely to all pregnant women in the United States for the past 40 years that have a PPV of only 3.5% or 1 in 29.

97.     On March 9, 2022, Hindenburg Research published an investigative report, which among other allegations, claimed that "Natera's revenue growth has been fueled by deceptive sales and billing practices aimed at doctors, insurance companies, and expectant mothers." The report specifically asserted:

> Natera has driven its revenue through a combination of (a) improper insurance billing, (b) promising women they will never have to pay more than certain low rates, then later engaging in aggressive practices to charge more and (c) "unbundling" test screens into multiple payment codes to attempt to charge BOTH payors and patients for the same overall screen.  While Natera's technology seems to provide a modest edge (after the necessary sequencing has taken place) we think the company's ascension to its top position in the industry has been mostly fueled by its willingness to engage in deceitful sales and billing practices.

98.     The Hindenburg Report expanded on Natera's alleged use of questionable sales strategies, particularly its practice of automatically including the optional microdeletion screening with every Panorama test unless explicitly declined by a doctor. Additionally, the report accused Natera of routinely denying customers detailed invoices and of promoting lower out-of-pocket costs to encourage patients to bypass their health insurance, potentially constituting insurance fraud and tortious interference with contracts.

99.     The report also disclosed an investigation into Natera by Michigan state officials. It highlighted that Michigan's Department of Attorney General, citing an active inquiry, declined to release documents regarding Natera under the state's Freedom of Information Act.

100.    The Hindenburg Report summarized its findings by stating that "Natera's tests just don't add much value to the health industry ecosystem relative to competitors," noting that "[i]ts NIPTs are [only] marginally better than the competition, and its microdeletion screens regularly result in more harm than good."

101.    Following this news, Natera's stock experienced a significant drop, plunging

over 52%, from a closing price of $54.75 per share on March 8, 2022, to a low of $26.10 per share during the day on March 9, 2022.

102.    On March 14, 2022, a federal jury in the case of *CareDx, Inc. v. Natera, Inc.*, found Natera had intentionally and willfully misled the public through false advertising of its Prospera product, in violation of the federal Lanham Act, the Delaware Deceptive Trade Practices Act, and Delaware common law.

103.    In this lawsuit, CareDx accused Natera of using flawed clinical trial results to make false claims about Prospera, asserting it was more effective than CareDx's AlloSure test. The jury held Natera accountable for false advertising when it claimed Prospera had advantages such as "[m]ore sensitive and specific than current assessment tools across all types of rejection," among others. CareDx was awarded $44.9 million in damages, including $23.7 million in punitive damages.

104.    This verdict led to a further decline in Natera's stock value, dropping approximately 22.5%, from a high of $39.13 per share on March 14, 2022, to $30.32 per share at the close on March 15, 2022.

105.    On April 19, 2022, the FDA issued a safety communication aimed at educating patients and healthcare providers and reducing inappropriate NIPT use. The FDA raised concerns about NIPT providers claiming their tests to be "reliable" and "highly accurate" without solid scientific backing. Echoing the NYT Report, the FDA warned:

> False claims may cause patients as well as health care providers to believe the test results are reliable and can be used alone to make decisions about the pregnancy. In addition, because some of the genetic abnormalities and disorders are so rare, in cases such as detection of a microdeletion, there may be a high chance that a positive result is actually from a fetus that does not have the genetic abnormality reported by the test.

106.    The FDA highlighted the potential for false claims to mislead patients and

healthcare providers into overestimating the reliability of test results, leading to uninformed pregnancy-related decisions. The communication also pointed out the high likelihood of false positives in rare genetic conditions like microdeletions.

107.    The FDA's communication further noted instances where initial screening tests indicated genetic abnormalities, but subsequent diagnostic tests confirmed the fetus was healthy. It advised patients to thoroughly discuss NIPT's benefits and risks with healthcare providers before making any decisions based on its results. The FDA also cautioned healthcare providers against solely relying on NIPT for diagnosing chromosomal abnormalities or disorders.

108.    Following the FDA's communication, Natera's stock experienced a decline, falling about 3.9%, from a high of $39.63 per share on April 19, 2022, to $38.10 per share at the close on April 20, 2022.

## INSIDER SELLING

109.    Before the full disclosure by Natera and understanding by the market of Panorama's questionable reliability, Prospera's lack of superior precision, the potential for substantial legal and regulatory challenges, and Natera's use of deceptive sales and billing tactics Defendants S. Chapman, Rabinowitz, Botha, Rosenman, Sheena, and Brophy ("Insider Trading Defendants") sold nearly two-million shares while in possession of material non-public information regarding the Company's business growth.

110.    Defendant S. Chapman sold 846,645 Natera shares, while the price of the Company's stock was artificially inflated for approximately $73,803,507 in proceeds while in possession of material, non-public information. As CEO, Defendant S. Chapman knew the truth about (i) Panorama's questionable reliability, namely, that it was leading to a significant number of false positive results; (ii) Prospera's lack of superior precision when compared to its market

competitors; (iii) the likelihood of significant legal and regulatory challenges because of misleading claims regarding Natera's technology; and (iv) the use of deceptive sales and billing tactics to drive Natera's revenue growth.

111.     Defendant Rabinowitz sold 508,356 Natera shares, while the price of the Company's stock was artificially inflated for approximately $38,256,680 in proceeds while in possession of material, non-public information. As Chairman of the Board and the Company's former CEO, Defendant Rabinowitz knew the truth about (i) Panorama's questionable reliability, namely,  that it was leading to a significant number of false positive results; (ii) Prospera's lack of superior precision when compared to its market competitors; (iii) the likelihood of significant legal and regulatory challenges because of misleading claims regarding Natera's technology; and (iv) the use of deceptive sales and billing tactics to drive Natera's revenue growth.

112.     Defendant Botha sold a total of 67,887 Natera shares, while the price of the Company's stock was artificially inflated for approximately $6,353,885 in proceeds while in possession of material, non-public information. As a director, Defendant Botha knew the truth about (i) Panorama's questionable reliability, namely,  that it was leading to a significant number of false positive results; (ii) Prospera's lack of superior precision when compared to its market competitors; (iii) the likelihood of significant legal and regulatory challenges because of misleading claims regarding Natera's technology; and (iv) the use of deceptive sales and billing tactics to drive Natera's revenue growth.

113.     Defendant Rosenman sold 44,503 Natera shares, while the price of the Company's stock was artificially inflated for approximately $5,224,302 in proceeds while in possession of material, non-public information. As a director and the Company's former CFO, Defendant Rosenman knew the truth about (i) Panorama's questionable reliability, namely,  that

it was leading to a significant number of false positive results; (ii) Prospera's lack of superior precision when compared to its market competitors; (iii) the likelihood of significant legal and regulatory challenges because of misleading claims regarding Natera's technology; and (iv) the use of deceptive sales and billing tactics to drive Natera's revenue growth.

114.    Defendant Sheena sold 262,379 Natera shares, while the price of the Company's stock was artificially inflated for approximately $15,904,606 in proceeds while in possession of material, non-public information. As a director, Defendant Sheena knew the truth about (i) Panorama's questionable reliability, namely,  that it was leading to a significant number of false positive results; (ii) Prospera's lack of superior precision when compared to its market competitors; (iii) the likelihood of significant legal and regulatory challenges because of misleading claims regarding Natera's technology; and (iv) the use of deceptive sales and billing tactics to drive Natera's revenue growth.

115.    Defendant Brophy sold 262,392 Natera shares, while the price of the Company's stock was artificially inflated for approximately $24,943,773 in proceeds while in possession of material, non-public information. As CFO, Defendant Brophy knew the truth about (i) Panorama's questionable reliability, namely,  that it was leading to a significant number of false positive results; (ii) Prospera's lack of superior precision when compared to its market competitors; (iii) the likelihood of significant legal and regulatory challenges because of misleading claims regarding Natera's technology; and (iv) the use of deceptive sales and billing tactics to drive Natera's revenue growth.

## Summary of the Individual Defendants' Wrongful Conduct

116.    The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the

Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

117.    The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls and procedures.

118.    The Individual Defendants breached their fiduciary duties to Natera because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch that: (i) Panorama's reliability was questionable, leading to a significant number of false positive results; (ii) Prospera's precision was not superior when compared to its market competitors; (iii) due to the misleading nature of Defendants' claims regarding Natera's technology, the Company faced significant legal and regulatory challenges; (iv) Natera's revenue growth was attributable to deceptive sales and billing tactics; and (v) as a consequence of these issues, the Individual Defendants' assertions regarding the Company's operational, financial, and growth aspects were not founded on a reasonable assessment.

## DAMAGES TO NATERA

119.    As a direct and proximate result of the Individual Defendants' conduct, Natera will lose and expend many millions of dollars.

120.    Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its CEO, CFO, and executive chairman, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

122.    As a direct and proximate result of the Director Defendants' conduct, Natera has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

### NATERA'S NON-EMPLOYEE DIRECTOR COMPENSATION

123.    The Board and Compensation Committee have repeatedly approved excessive director compensation without the approval of shareholders and without providing information or data to support their decisions.  Notably, as the Company's share price fell from 2020 through 2022, the Board continued to increase its own compensation.

124.    As reflected in the chart below from the Company's Annual Proxy filed with the SEC on April 13, 2021, annual compensation per non-employee director in 2020 was $326,781.14.[1]

| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2)(3) | Option Awards ($)(4)(5) | Total ($) |
|---|---|---|---|---|
| Dr. Roy Baynes | 50,000 | 116,896 | 144,977 | 311,873 |
| Dr. Monica Bertagnolli* | — | — | — | — |
| Roelof Botha | — | — | 393,419 | 393,419 |
| Dr. Rowan Chapman | 52,500 | 116,896 | 144,977 | 314,373 |

[1] Excluding Dr. Monica Bertagnolli who was elected to the Board effective as of November 17, 2020 and did not receive any compensation prior to the Company's 2021 Annual Meeting of Stockholders.

| | | | | |
|---|---|---|---|---|
| Todd Cozzens | 70,000 | 233,792 | — | 303,792 |
| Dr. James Healy | 57,500 | 116,896 | 144,977 | 319,373 |
| Dr. Gail Marcus | 32,917 | 233,792 | 45,223 | 311,932 |
| Herm Rosenman | 70,833 | 116,896 | 144,977 | 332,706 |

125.     As reflected in the chart below from the Company's Annual Proxy filed with the SEC on April 13, 2022, annual compensation per non-employee director in 2021 was $356,268.75.

| Name | ($)[1] | ($)[2][3] | ($)[2][4] | ($) |
|---|---|---|---|---|
| Dr. Roy Baynes | 50,000 | 123,041 | 161,079 | 334,120 |
| Dr. Monica Bertagnolli* | 27,083 | 184,514 | 241,557 | 453,154 |
| Roelof Botha | 74,852 | — | 322,158 | 397,011 |
| Dr. Rowan Chapman | 52,500 | 123,041 | 161,079 | 336,620 |
| Todd Cozzens | 70,000 | 246,082 | — | 316,082 |
| Dr. James Healy | 61,458 | 123,041 | 161,079 | 345,578 |
| Dr. Gail Marcus | 64,833 | 246,082 | — | 310,965 |
| Herm Rosenman | 72,500 | 123,041 | 161,079 | 356,620 |

126.     As reflected in the chart below from the Company's Annual Proxy filed with the SEC on April 20, 2022, annual compensation per non-employee director in 2023 was $395,341.00.[2]

| Name | Fees Earned or Paid in Cash ($)[1] | Stock Awards ($)[2][3] | Option Awards ($)[2][4] | Total ($) |
|---|---|---|---|---|
| Roy Baynes | 50,888 | 145,565 | 196,878 | 393,331 |
| Monica Bertagnolli* | 26,425 | 291,131 | — | 317,556 |
| Roelof Botha | 84,916 | — | 393,755 | 478,671 |
| Rowan Chapman | 56,436 | 145,565 | 196,878 | 398,879 |
| Todd Cozzens** | 17,500 | — | — | 17,500 |
| James Healy | 63,620 | 145,565 | 196,878 | 406,063 |
| Gail Marcus | 65,482 | 291,131 | — | 356,613 |
| Herm Rosenman | 73,831 | 145,565 | 196,878 | 416,274 |

---

[2] Excluding Todd Cozzens who resigned from our board of directors effective May 26, 2022 and received $17,500 for the year.

127.    These amounts are excessive, and significantly exceed the average director compensation for non-employee directors on boards of "large-cap" companies, companies included in the S&P 500, and even the largest companies in the country, which are included within the Top 200 Company list.[3]

128.    Natera is neither a Top 200 Company, member of the S&P 500, nor even a large-cap company. Indeed, with a current market capitalization of approximately $7.11 billion, Natera is considered a "mid-cap" company.

129.    Natera attempts to justify its director compensation in the 2022 Proxy with the following:

> Our compensation committee retains the services of Aon to advise it on the structure of our director compensation program and executive officers may make recommendations on the form and amount of director compensation, but the board makes the final decision and is not bound by compensation committee or executive officer recommendations.

130.    That a compensation consultant was retained and did work is insufficient to establish the appropriateness of the Company's non-employee director compensation. Just because a consultant was retained does not mean that their advice was sound or followed.

131.    Natera's non-employee director compensation would be shocking enough, even at a large and profitable Company. Here, however, it lacks even the appearance of propriety, given

---

[3] *See* NACD and Pearl Meyer 2020-2021 Director Compensation Report (average of median total direct annual compensation of $311,955 for non-employee directors at a Top 200 Company (with market capitalizations exceeding $10 billion), and an average of median total direct annual compensation of $256,225 for non-employee directors at large-cap companies (with market capitalizations between $2.5 billion and $10 billion)); 2021 U.S. Spencer Stuart Board Index (total average compensation of $312,279 for non-employee directors at S&P 500 companies); 2020 U.S. Spencer Stuart Board Index (total average compensation of $308,462 for non- employee directors at S&P 500 companies); 2019 U.S. Spencer Stuart Board Index (total average compensation of $304,856 for non-employee directors at S&P 500 companies); 2018 U.S. Spencer Stuart Board Index (total average compensation of $298,981 for non-employee directors at S&P 500 companies).

that the Company operates at a loss.  Thus, the Company's non-director compensation practices seem to take no consideration of its financial well-being whatsoever and have harmed the Company and its stockholders.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

132.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

133.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

134.     Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

135.     Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

136.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

137.     Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

138.     The Company Board is currently comprised of ten members: Defendants Baynes, Botha, R. Chapman, S. Chapman, Healy, Marcus, Rabinowitz, Rosenman, Sheena (collectively,

the "Directors"), and non-party Ruth E. Williams-Brinkley. Thus, Plaintiff is only required to show that a majority of the Defendants, *i.e.*, five, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

139.    Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

140.    Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

141.    All of the Director Defendants receive the challenged compensation, stand on both sides of the compensation awards, and have a direct interest in the transactions at issue. Additionally, the challenged compensation constitutes a substantial personal benefit to the Director Defendants. The Director Defendants therefore breached their fiduciary duties, are not disinterested, and demand is excused as to them.

142.    Additionally, each of the Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

### Defendants S. Chapman, Rabinowitz, and Sheena

143.    As employees and/or co-founders, Defendants S. Chapman, Rabinowitz, and Sheena derive substantially all of their wealth and livelihood from keeping the Company's stock

price as high as possible making them not disinterested or independent.

144.     Defendants S. Chapman, Rabinowitz, and Sheena engaged in corporate misconduct by violating Natera's Code of Conduct because they possessed non-public information regarding Panorama's questionable reliability, Prospera's lack of superior precision, the likelihood of significant legal and regulatory challenges, and the use of deceptive sales and billing tactics to drive growth and engaged in self-dealing by trading on such information.

145.     Defendant S. Chapman, while in possession of material non-public information, sold 846,645 shares of the Company's stock at various prices per share for a windfall of $73.8 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements.  As a result of his insider selling, Defendant S. Chapman may be personally subject to disgorgement.

146.     Defendant Rabinowitz, while in possession of material non-public information, sold 508,356 shares of the Company's stock at various prices per share for a windfall of $38.2 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements.  As a result of his insider selling, Defendant Rabinowitz may be personally subject to disgorgement.

147.     Defendant Sheena, while in possession of material non-public information, sold 262,379  shares of the Company's stock at various prices per share for a windfall of $15.9 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements.  As a result of his insider selling, Defendant Sheena may be personally subject to disgorgement.

148.     Defendants S. Chapman and Rabinowitz are defendants in the Securities Action, which seeks to hold them liable for much of the same wrongdoing as is alleged herein.

149.     For these reasons, Defendants S. Chapman, Rabinowitz, and Sheena breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Defendants Rosenman, R. Chapman, Healy and Marcus**

150.     Defendants Rosenman (Chair), R. Chapman, Healy and Marcus are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, these Defendants caused these improper statements.

151.     Defendant Rosenman engaged in corporate misconduct by violating Natera's Code of Conduct because he possessed non-public information regarding Panorama's questionable reliability, Prospera's lack of superior precision, the likelihood of significant legal and regulatory challenges, and the use of deceptive sales and billing tactics to drive growth and engaged in self-dealing by trading on such information.

152.     Defendant Rosenman, while in possession of material non-public information, sold 44,503 shares of the Company's stock at various prices per share for a windfall of $5.2 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements.  As a result of his insider selling, Defendant Rosenman may be personally subject to disgorgement.

153.    For these reasons, Rosenman (Chair), R. Chapman, Healy and Marcus breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Defendant Botha**

154.    Defendant Botha, while in possession of material non-public information, sold 67,887 shares of the Company's stock at various prices per share for a windfall of $6.3 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements.   As a result of his insider selling, Defendant Botha may be personally subject to disgorgement, and thus demand upon him is futile and, therefore, excused.

155.    Nine director defendants signed the Company's 2019 and 2020 10-Ks, which (as alleged herein and in the Securities Action) contained false and misleading statements.

156.    The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires the Directors to also adhere to Natera's standards of business conduct. The Directors did not comply with the requirements of the Code of Conduct.  The Directors violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

157.    Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the

Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand upon the Directors would be futile.

158.    Natera has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Natera any part of the damages Natera suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

159.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

160.    The acts complained of herein constitute violations of fiduciary duties owed by Natera's officers and directors, and these acts are incapable of ratification.

161.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Natera. If there is a directors' and officers' liability

insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Natera, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

162.    If there is no directors' and officers' liability insurance, then the Directors will not cause Natera to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

163.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### CLAIMS FOR RELIEF

### COUNT I
**Breach of Fiduciary Duty**
**Against the Individual Defendants**

164.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

165.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Natera's business and affairs.

166.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual

Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Natera's shareholders.

167.    In breach of their fiduciary duties owed to Natera, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

168.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Natera's securities.

169.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Natera's securities.

170.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Natera has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff, on behalf of Natera, has no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duty – Excessive Compensation
### Against the Director Defendants

172.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

173.    The Director Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligations of good faith, candor, loyalty, and due care.

174.    The Director Defendants, together and individually, violated and breached their fiduciary duties of good faith, candor, loyalty, and due care. Specifically, the Director Defendants approved their own improper and grossly excessive compensation without meaningful limits or controls, and without regard for the compensation paid by peers, or the Company's stock price, revenue, and market capitalization.

175.    The Director Defendants also breached their fiduciary duties to Company shareholders by failing to take remedial action in the face of these excessive awards.

176.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Natera has sustained significant damages. As a result, the Director Defendants are liable to the Company.

**COUNT III**
**Violations of Section 14(a) of the Exchange Act**
**Against the Director Defendants**

177.     Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

178.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

179.     Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

180.     Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Annual Proxies filed with the SEC on April 16, 2020 ("2020 Proxy") and April 13, 2021 ("2021 Proxy"). Specifically, the 2020 and 2021 Proxy Statements contained false statements and failed to disclose that (1) Panorama's reliability was questionable, leading to a significant number of false positive results; (2) Prospera's precision was not superior when compared to its market competitors; (3) due to the misleading nature of Defendants' claims regarding Natera's technology, the Company faced significant legal and regulatory challenges; (4) Natera's revenue growth was attributable to deceptive sales and billing tactics; and (5) as a consequence of these issues, the Individual Defendants' assertions regarding the Company's operational, financial, and growth aspects were not founded on a reasonable

52

assessment.

181.     The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the 2020 and 2021 Proxies were materially false and misleading.

182.     The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2020 and 2021 Proxies.

183.     Plaintiff has no adequate remedy at law.

**<u>COUNT IV</u>**
**Breach of Fiduciary Duty – Misappropriation of Material, Non-Public Information**
**Against the Insider Trading Defendants**

184.     Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

185.     At the time that the Insider Trading Defendants sold their Natera stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

186.     The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Natera stock.

187.     The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

188.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, any profits made by the

Insider Trading Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

**COUNT V**
**Unjust Enrichment**
**Against the Individual Defendants**

189.     Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

190.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Natera.

191.    Each of the Defendants received payment from Natera, in the form of either salary or director fees while actively breaching their fiduciary duties to Natera.

192.    All the payments and benefits provided to defendants were at the expense of Natera. The Company received no benefit from these payments.

193.    Plaintiff, as a shareholder and a representative of Natera, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties. Plaintiff on behalf of Natera, has no adequate remedy at law.

**COUNT VI**
**Waste of Corporate Assets**
**Against the Individual Defendants**

194.     Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

195.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Natera to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

196.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

197.   Plaintiff on behalf of Natera has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)   Declaring that the Plaintiff may maintain this action on behalf of Natera, and that Plaintiff is an adequate representative of the Company;

b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Natera;

c)   Determining and awarding to Natera the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)   Directing the Individual Defendants to take all necessary actions to reform and improve Natera's corporate governance and internal procedures to comply with applicable laws and to protect Natera and its shareholders from a repeat of the damaging events described herein;

e)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f)   Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: January 12, 2024

                                        **DELEEUW LAW LLC**

                                        */s/ P. Bradford deLeeuw*
                                        P. Bradford deLeeuw  (#3569)
                                        1301 Walnut Green Road
                                        Wilmington, DE 19807
                                        Phone: (302) 274-2180
                                        brad@deleeuwlaw.com

OF COUNSEL:

**KUEHN LAW, PLLC**
Justin Kuehn
53 Hill Street, Suite 605
Southampton, NY 11968
Phone: (833) 672-0814
justin@kuehn.law

                                        *Attorneys for Plaintiff*